**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEEFEL, LEVITT & WEISS, | No. C-03-0440 JCS |
| Plaintiff(s), | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT [Docket Nos. 87, 91]** |
| ASTOR HOLDINGS, INC., ET AL., | |
| Defendant(s). | |
| _____/ | |

## I.      INTRODUCTION

On Friday, May 6, 2005, the following motions came on for hearing: 1)  Steefel Levitt & Weiss'
Motion for Summary Judgment ("Steefel Motion"); and 2) William R. Pascoe and Pascoe & Rafton's
Joinder in Motion and Motion for Summary Judgment ("Pascoe Motion").[1]  For the reasons stated below,
the Motions are GRANTED in part and DENIED in part.[2]

## II.     BACKGROUND

### A.      Facts[3]

In 1994, Marc Thorpe entered into a joint venture with Profile Records, a company owned by
Steven Plotnicki.  Plaintiff Steefel Levitt & Weiss' Appendix of Exhibits in Support of Motion for Summary

---

[1]Hereinafter, the Court refers collectively to the Steefel and Pascoe Motions as "the Motions."

[2]Steefel and Pascoe have requested that the Court take judicial notice of various documents filed in the Thorpe bankruptcy proceeding and in the various actions filed in the district court for the Southern District of New York.  Astor has not objected to these requests, which the Court grants.

[3]  Although Steefel filed a "Joint Separate Statement of Undisputed Fact" (hereinafter, referred to as "Steefel Separate Statement"), the parties did not jointly submit a statement of undisputed facts.  Nor have Defendants submitted their own statement of undisputed facts.  Defendants have, however, produced some evidence in support of their Opposition briefs.  Under these circumstances, the Court relies on facts that it finds, based on the record before it, to be undisputed, unless otherwise indicated.

United States District Court

For the Northern District of California

Judgment ("Steefel's Appendix"), Ex. 1 (Complaint, *Robot Wars LLC v. Thorpe et al.,* Case No. 97 CIV 5536) at 3. Profile Records later became Profile Holdings and then Astor Holdings, Inc. (hereinafter, all three companies will be referred to collectively as "Astor"). *Id.* Thorpe was a designer who, prior to the creation of the joint venture, had the idea of creating radio-controlled robots and conducting sporting events in which the robots would compete called "Robot Wars." *Id.* at 2-3. The purpose of the joint venture was to promote "activities relating to Robot Wars, including the staging of Robot War Events," with Thorpe providing the ideas and Astor providing the financing. *Id.*

On July 25, 1997, Astor sued Thorpe in the United States District Court for the Southern District of New York (*Roski I*) for injunctive relief and damages. *Id.* Astor alleged that Thorpe had secretly planned a Robot Wars event, scheduled to occur in August 1997, in violation of the joint venture agreement and that he had used the Robot Wars mark without authorization. *Id.* Fran Jacobs, of the firm Duane, Morris & Heckscher (hereinafter, "DM"), represented Astor. *Id.*

On May 27, 1998, Thorpe filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of California. Steefel's Appendix, Ex. 21 (Chandler Depo.) at 127. The bankruptcy proceeding stayed the New York action against Thorpe (*Roski I*) under 11 U.S.C. §§ 362 *et seq.* On June 10, 1998, Astor retained William Pascoe to obtain relief from the stay. Declaration of William Pascoe ("Pascoe Decl."), ¶ 3 & Ex. B (Fee Agreement). In an amended complaint filed in 1998 in *Roski I*, Astor alleged that the bankruptcy proceeding was brought to "freeze the Robot Wars Business and keep [Astor] from realizing any return on its investment." Steefel's Appendix, Ex. 2 at 26. However, no explicit finding of bad faith was made by Judge Jaroslavsky in the bankruptcy proceeding.

Eventually, in 1999, Astor and Thorpe reached a settlement in the bankruptcy proceeding, under which Astor agreed to pay Thorpe $250,000 and 10 % of future Robot Wars royalties and Thorpe agreed to promote one final Robot Wars event, assist in "rehabilitating" Astor owner Plotnicki's reputation with "roboteers" and refrain from direct competition with Robot Wars. Steefel's Appendix, Ex. 5 (February 3, 1999 Settlement Agreement).

Meanwhile, in *Roski I,* Astor filed an "Amended and Supplemental Complaint" adding Edward Roski as well as several other individuals as defendants. Steefel's Appendix, Ex. 2 (Amended and Supplemental Complaint, Filed August 4, 1998). Astor alleged that Roski and Thorpe (and others

unrelated to this action) were involved in a conspiracy against Robot Wars and Astor.  Because the stay was still in place as to Thorpe, the Amended and Supplemental Complaint stated that "no relief is now sought against Thorpe, the complaint has not been amended to add any new claims directed against him, and no action will be taken against Thorpe without permission of the Bankruptcy Court while his case is pending if such action invokes the automatic stay."  *Id.*

On April 22, 1999, Astor filed a separate action against Roski in which Thorpe was not named as a Defendant (*Roski II)*.  Steefel's Appendix, Ex. 6 (Complaint, *Robot Wars LLC v. Roski, et al.,* Case No. 99 CV 2953).

Sometime in 1999, Astor and Thorpe began to accuse each other of violating the Settlement Agreement in the bankruptcy proceeding and an adversary proceeding ("the First Adversary Proceeding") before Judge Jaroslavsky ensued.  Steefel's Appendix, Ex. 4 (Memorandum and Decision, Filed August 8, 2000 ("the August 8, 2000 Order")).  In the First Adversary Proceeding, Thorpe sought to recover the $250,000.00 Astor agreed to pay under the Settlement Agreement and Astor sought damages in excess of $600,000.00 from Thorpe, alleging that he had failed to use best efforts to rehabilitate Astor's reputation, as required under the Settlement Agreement.  *Id.* at 2, 4.  Judge Jaroslavsky conducted a trial on the merits and concluded that Thorpe had breached the Settlement Agreement while Astor had not.  *Id*.  However, Judge Jaroslavsky limited Astor's damages to approximately $225,000.00 on the basis that the damage to its reputation had resulted in part, from its own conduct.  *Id.* at 4.  Judge Jaroslavsky then offset the $225,000.00 in damages with Astor's obligation to pay Thorpe $250,000.00 under the Settlement Agreement, resulting in a judgment in favor of Thorpe in the amount of approximately $25,000.00.  *Id.* at 4.

Astor appealed the August 8, 2000 Order, retaining Steefel shareholder Harvey Schochet to prosecute the appeal.  Steefel's Appendix, Ex. 22 (Schochet Depo.) at 94.  Plotnicki testified in his deposition that Schochet had been retained because both he and Fran Jacobs had been dissatisfied with Pascoe's representation in the First Adversary Proceeding.  Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 39.[4]  After Plotnicki, Schochet and Jacobs conducted initial discussions, Astor also agreed to retain Schochet's firm, Steefel, on an hourly basis to prosecute the appeal.  Steefel's Appendix, Ex. 23 (Plotnicki

---

[4]Pascoe continued, however, to represent Astor in the "core" bankruptcy proceeding.  Steefel's Appendix, Ex. 22 (Schochet Depo.) at 104.

Depo.) at 71-72; Steefel's Appendix, Ex. 25 (Engagement Letter). Plotnicki signed the Engagement Letter after his in-house counsel had reviewed it and made some revisions. Steefel's Appendix, Ex. 25 (August 20, 2001 Letter from Plotnicki to Schochet).

In February 2001, while the appeal in the First Adversary Proceeding was still pending, Thorpe filed a proposed reorganization plan ("the Reorganization Plan" or "the Plan") in the underlying bankruptcy action. Steefel's Appendix, Ex. 22 (Schochet Depo.) at 106. Because the proposed plan had implications for the appeal in the First Adversary Proceeding and a contemplated action against Roski in New York (discussed below), this development in the bankruptcy led to "an entirely new kind of conversation" between Plotnicki, Pascoe, Schochet and Jacobs. Steefel's Appendix, Ex. 22 (Schochet Depo.) at 107; *see also id.* at 129 (Schochet describes himself, Pascoe and Jacobs as "the advisory team" in testifying about advice that was given to Plotnicki in connection with filing of the New York Action). Plotnicki concluded that the Plan was not in Astor's interests. *Id.* at 116. However, on April 30, 2001, following a confirmation hearing, the Plan was confirmed by Judge Jaroslavsky. Steefel's Appendix, Ex. 19 (Order Confirming Chapter 11 Plan).

The parties appear to dispute whether the Plan was confirmed over Astor's objection or, alternatively, whether Pascoe failed to object to the Plan on Astor's behalf. In his declaration, Plotnicki states that "[i]f Mr. Pascoe had not compromised [Astor's] position at the bankruptcy plan confirmation, Astor would have appealed any confirmation of Thorpe's plan." Plotnicki Decl., ¶ 7. Steefel, on the other hand, states in its brief, that the Plan was confirmed "over Astor's objections." Steefel Motion at 11. Similarly, Pascoe states in his Reply that he "strongly disputes that he acted without Astor's authority in any respect at the confirmation hearing in April 2001." Pascoe Reply at 7.

In an order dated June 11, 2001, the bankruptcy court described Astor's position at the confirmation hearing as follows:

> After a full trial, the court determined that creditor Astor Holdings, Inc., has no claim against debtors Marc and Denise Thorpe. Astor was given the opportunity to stay the court's judgment pending appeal, but elected not to do so. Nonetheless, Astor objected to the debtor's Chapter 11 plan of reorganization using the argument that if it prevailed on appeal, and if it was thereafter found to have a priority claim, there would not be enough money in the estate to pay it.

4

**United States District Court**

For the Northern District of California

1
2
3
4

The court was disinclined to permit Astor to block confirmation based on the possibility that an unstayed judgment against it might be reversed on appeal. Seeing this, and with the court's active participation, the parties seemed to reach an agreement in open court whereby the plan would be confirmed but the proceeds of a $150,000.00 loan being used to fund a plan would be held pending appeal. In return, Astor agreed that if those funds were not sufficient then any unpaid balance would be discharged.

5
6
7
8

It now appears that there was no meeting of the minds, as can often happen when a settlement is reached in court when each side is thinking on its feet and the court it not fully aware of all the possibilities. Astor points out that in addition to the contemplated funds of about $150,000.00, there could possibly be additional royalty money coming into the estate some time in the future. [Footnote omitted].

9
10
11
12
13
14

Whatever the parties were thinking, in the court's mind the *quid pro quo* was that Astor, in return for waiving any unpaid administrative claim it might some time in the future acquire, would share in whatever was in the estate, and not just the $150,000.00 loan proceeds. Therefore, if it felt free to do so, it would either amend the order confirming the plan to reflect this or, much more likely, simply overrule Astor's objection and confirm the plan as originally proposed. However, the court notes that Astor has appealed the order confirming the plan, thereby depriving the court of jurisdiction to make the changes Astor seeks. *In re Padilla*, 222 F.3d 1184, 1190 (9th Cir. 2000).

15
16

Accordingly, the motion to reconsider confirmation will be denied without prejudice. Counsel for the debtors shall submit the appropriate form of order.

17   William R. Pascoe and Pascoe & Rafton's Request for Judicial Notice in Support of Joinder in Motion and

18   Motion for Summary Judgment ("Pascoe Request for Judicial Notice"), Ex. B (June 11, 2001 order of

19   bankruptcy court denying motion to reconsider confirmation of Reorganization Plan without prejudice).

20   Prior to the confirmation of the Reorganization Plan by the bankruptcy court, Astor filed two

21   actions in New York. The first action, against Roski and his company, Battlebots, but not against Thorpe,

22   was filed on March 5, 2001 (*Roski III*). Steefel's Appendix, Ex. 7 (Complaint, *Astor Holdings, Inc. v.*

23   *Rosky*, Case No. 01 CV 1905). In that action, Astor alleged two causes of action for tortious interference,

24   a cause of action for aiding and abetting Thorpe's breach of his fiduciary duty to Robot Wars and a cause

25   of action for unjust enrichment. *Id.* The complaint in *Roski III* was drafted and signed by Fran Jacobs.

26   Steefel's Appendix, Ex. 27 (Jacobs Depo.) at 46 (testimony that in early 2001, Jacobs was researching

27   and drafting the complaint in *Roski III*). Jacobs testified in her deposition that she sent copies of the draft

28   complaint in *Roski III* to both Schochet and Pascoe. Opposition to Pascoe & Rafton's Motion for

Summary Judgment ("Opposition (Pascoe)"), Ex. G (Jacobs Depo.) at 161.  In particular, she testified as

follows:

> A:   Both of them were sent drafts of the complaint against Roski and
>      asked to consider the bankruptcy ramifications and impact it would
>      have on the claims against Thorpe and whether there were any
>      bankruptcy issues we should consider . . .
>
> Q:   When you say any bankruptcy issues to be considered, what
>      specifically did you ask Mr. Schochet or Mr. Pascoe to do in that
>      regard?
>
> A:   I think what I was asking them to do was look at it as bankruptcy
>      lawyers and consider the things that would be something that
>      bankruptcy lawyers would understand.
>
> Q:   Did either Mr. Pascoe or Mr. Schochet make any specific
>      suggestions to you about the substance of particular claims that you
>      proposed to assert against Mr. Roski?
>
> A:   I don't recall that.

*Id.*  Elsewhere in her deposition, Jacobs testified that the complaint in *Roski III* was "reviewed by" both

Pascoe and Schochet.  Reply Declaration of David W. Evans in Support of Plaintiff Steefel Levitt & Weiss'

Motion for Summary Judgment ("Evans Reply Decl."), Ex. 39 (Jacobs Depo.) at 259.

In an e-mail to Schochet dated March 1, 2001 – four days before the complaint was filed in *Roski*

*III* – Jacobs wrote as follows:

> Harvey –
>
> Steve is now anxious to file the complaint tomorrow.  Let me know if you
> will have time to look at it before then.  Although I don't think there's
> anything in there we haven't said before, I want to be sure we don't say
> anything that would hurt us in the bankruptcy case.
>
> I've also forwarded the complaint to Bill.
>
> A copy of the latest draft is attached.
>
> – Fran

Evans Reply Decl., Ex. 42.  The next day, Schochet faxed the complaint to Jacob with his edits.  *Id.*

Virtually all of the edits consisted of grammatical and punctuation corrections, and minor phrasing changes.

United States District Court

For the Northern District of California

1    *Id.* There is no evidence in the record that Pascoe provided any input to Jacobs regarding the *Roski III*

2    complaint.

3         The second action, against Thorpe, was filed on April 16, 2001 ("The New York Action").

4    Steefel's Appendix, Ex. 8 (Complaint).  The complaint in that action as well was drafted and filed by Fran

5    Jacobs, of Duane Morris.  Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 193-194.  Jacobs testified in

6    her deposition that she sent a copy of this complaint to Schochet "and told him that it would not be filed

7    without his stamp of approval, and he told [Jacobs] he would get back to her and assured [her] that he

8    would fill in the appropriate bankruptcy citations."[5]  Steefel's Appendix, Ex. 27 (Jacobs Depo.) at 53-54.

9    Schochet faxed proposed revisions to Jacobs on the day the complaint was filed.  Steefel's Appendix, Ex.

10   28 (April 16, 2001 fax from Schochet to Jacobs).  The revisions included the insertion of more specific

11   language regarding aspects of the bankruptcy proceeding.  *Id.*   In addition, Plotnicki testified that Schochet

12   analyzed the jurisdiction and venue provisions of the 1999 Settlement Agreement to determine whether the

13   action against Thorpe could be filed in New York.  Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 201-

14   202.

15        Following confirmation of the Reorganization Plan, Thorpe's bankruptcy counsel, David Chandler,

16   demanded in a letter to Jacobs that the New York Action be dismissed because the Reorganization Plan

17   had been confirmed and Astor had failed to object to the discharge provision.  Steefel's Appendix, Ex. 22

18   (Schochet Depo.) at 169-170; Steefel's Appendix, Ex. 29 (Jacobs e-mail dated April 26, 2001).[6]  Astor

19   refused to withdraw the complaint and on May 3, 2001, Thorpe filed a second adversary proceeding in the

20   bankruptcy action to enjoin the New York Action ("the Second Adversary Proceeding" or "the Contempt

21   Proceeding").  Judge Jaroslavsky enjoined all further proceedings in the New York Action and the parties

22   commenced discovery and then pre-trial proceedings.

23        Both before and after the New York Action was filed, Plotnicki, Jacobs, Pascoe and Schochet

24   held extensive discussions concerning the legal and strategy considerations associated with Astor's various

_____

26        [5]  In his declaration, Pascoe states that he was not provided a copy of the complaint in the New York
     Action.   Pascoe Decl. at 2.  Because there is no evidence in the record Pascoe *was* sent a copy of the
27   complaint, the Court takes this fact as undisputed.

28        [6]The letter itself was not provided to the Court by the parties.

proceedings.  Steefel's Appendix, Ex. 22 (Schochet Depo.) at 155 ("our conversations when we were all on the phone together, which occurred frequently enough, tended to be far-reaching and touched on all aspects of everything").  With respect to the New York Action, Plotnicki testified in his deposition that in a conference call, both Pascoe and Schochet told him he had to file the New York Action.  Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 195.  According to Plotnicki, "Mr. Schochet never explained that maintaining the suit in New York would violate a court order and what the consequences to that were or the potential consequences were when you violate a court order."  *Id.* at 211.  Plotnicki further testified that he wouldn't have filed the New York Action "had Mr. Schochet not told [him he] had to file it."  Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 195.  Similarly, in his declaration, Plotnicki states that neither "Mr. Schochet, nor any other of the attorneys even suggested that I or any of the attorneys could be held responsible personally for maintaining the Thorpe action in New York."  Plotnicki Decl. at 2.  According to Plotnicki, had he known this, he "would have had [Astor] dismiss the Thorpe action."  *Id*.

Schochet, on the other hand, testified in his deposition that the idea of filing the New York Action was not his, but Plotnicki's, and that after Thorpe filed the Second Adversary Proceeding he repeatedly advised Plotnicki that he should dismiss the New York Action.  Steefel's Appendix, Ex. 22 (Schochet Depo.) at 130-131, 162.  Nonetheless, Schochet conceded that he believed New York was an appropriate forum for the claims in the New York Action, that the action might help Astor in opposing confirmation of the Reorganization Plan, and that it could not legally provide a basis for an award of punitive damages in the Contempt Proceeding.  Steefel's Appendix, Ex. 22 (Schochet Depo.) at 160-163, 173.

While the Second Adversary Proceeding was pending, Judge Jenkins issued a decision with respect to the appeal in the First Adversary Proceeding, holding that the bankruptcy court had committed reversible error with respect to the damages calculation.  Steefel's Appendix, Ex. 10 (Order, filed June 29, 2001).  In his Order, Judge Jenkins reversed on damages and remanded to the bankruptcy court.  *Id.* However, Plotnicki instructed Steefel to appeal the decision to the Ninth Circuit rather than allow the case to return to Judge Jaroslavsky.

Also while the Second Adversary was proceeding, Plotnicki was appealing Judge Jaroslavsky's confirmation of the Reorganization Plan.  *See* Steefel's Appendix, Ex. 20 (Declaration of Harvey Schochet in Support of Emergency Stay).  In connection with that appeal, Plotnicki filed an emergency motion to stay

United States District Court

For the Northern District of California

1    implementation of the Reorganization Plan.  *Id.*  Before that motion was decided, and on the eve of trial in

2    the Contempt Proceeding, Plotnicki, based on the advice of an attorney named Andrew Kress and without

3    the involvement of Steefel or Pascoe, entered into a settlement with Thorpe.  Steefel's Appendix, Ex. 23

4    (Plotnicki Depo.) at 572-574.  On November 16, 2001, the Bankruptcy Appellate Panel granted

5    Plotnicki's motion to stay implementation of the Reorganization Plan without bond. Steefel's Appendix, Ex.

6    11 (Order Granting Stay, Filed November 13, 2001).  However, the bankruptcy litigation ended on

7    February 6, 2002 as a result of the settlement.[7]  *See Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251,

8    258 (S.D.N.Y. 2003).

9         The litigation in *Roski III* continued after the bankruptcy litigation settled.  On August 12, 2003, the

10   court granted Roski's motion for summary judgment on several of Astor's state law tort claims against

11   Roski that were based on the Thorpe bankruptcy, including the claim for aiding and abetting breach of

12   fiduciary duty.  Steefel's Appendix, Ex. 14 (August 12, 2003 Order).  The court concluded that these

13   claims required a finding of bad faith on the part of Thorpe in filing for bankruptcy and that, under the

14   doctrine of federal preemption, such a finding could only be made by the bankruptcy court.  *Id.*  Therefore,

15   the court held, these claims were barred.  *Id.*  Jacobs testified that because the aiding and abetting claim

16   overlapped with the claim for tortious interference – which was not barred – the dismissal of the preempted

17   claims affected only the availability of certain attorneys' fees.  Evans Reply Decl., Ex. 40 (Jacobs Depo.) at

18   411-412.  However, Plotnicki states in his declaration that had he known some of the claims were barred

19   by preemption, he would not have brought the action in the first place.  Plotnicki Decl. at 2.  The remaining

20   claims proceeded to trial, where the jury found in favor of Defendant Roski.  Evans Reply Decl., Ex. 40

21   (Jacobs Depo.) at 341; Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 489.

22        **B.    The Complaint**

23        On February 3, 2003, Steefel filed a complaint against Astor alleging that Astor owed it

24   $493,053.54 in outstanding legal fees and costs incurred in the course of representing Astor in the

25   bankruptcy proceeding.  Steefel's Appendix, Ex. 15 (Complaint) at 4.  Steefel asserted claims of breach of

26

27   _____

28        [7]Although the litigation did not end until February 2002, it is undisputed that an agreement in principal
     was reached sometime in November 2001.

contract and common counts (account stated, quantum meruit and open book account).  *Id.*  Astor, in turn,

asserted counterclaims for legal malpractice and breach of contract, naming not only Steefel but also

Harvey Schochet, William Pascoe and Pascoe & Rafton as counter defendants.  Steefel's Appendix, Ex.

16 (Answer to Complaint and Counterclaim for Professional Negligence and Breach of Contract).  Finally,

Pascoe and Pascoe & Rafton (hereinafter referred to collectively as "Pascoe"), in response to Astor's

malpractice and breach of contract claims, asserted counter claims of their own for breach of contract and

common counts to recover unpaid legal fees.

### C.   The Motions

In their Motions, Steefel and Pascoe (hereinafter referred to collectively as "the Moving Parties")

ask this Court to enter summary judgment in their favor on: 1) their claims for account stated with respect to

allegedly unpaid legal fees and costs; and 2) Astor's counterclaims for legal malpractice.  The Motions

make three basic arguments.

First, the Moving Parties assert that they are entitled to summary judgment on their account stated

claims because it is undisputed that the fee agreements were reviewed by Astor's independent counsel, that

Astor never objected to the monthly invoices reflecting a growing outstanding balance and that it failed to

pay the outstanding balances.

Second, the Moving Parties assert that they cannot be liable for malpractice with respect to their

representation of Astor in the Thorpe bankruptcy  – including any advice they may have given regarding

whether the New York Action might result in contempt sanctions in the bankruptcy proceeding – because:

a) they gave correct legal advice; b) they cannot be liable for any erroneous advice where the advice was

reasonable and involved legal issues where the law was not settled; and c) they cannot be liable for Astor's

settlement with Thorpe because the possibility that a better result could have been obtained is entirely

speculative and therefore did not result in any damages.

Third, the Moving Parties argue they cannot be liable for malpractice based on *Roski III* because:

a) there is no evidence Steefel or Pascoe owed a duty of care to Astor with respect to this litigation; and b)

there is no evidence any conduct by the Moving Parties was the proximate cause of any adverse result in

*Roski III* given that action was prosecuted by another law firm in another state.

United States District Court

For the Northern District of California

1      In its Opposition briefs, Astor asserts that summary judgment should not be entered against it for

2   the following reasons.  First, with respect to the account stated claims, Astor asserts that there is evidence

3   that it objected to the fees at issue.  With respect to Steefel's fees, Astor points to an e-mail dated

4   December 3, 2001, a letter to William Pascoe dated September 23, 2002 and two tolling agreements ("the

5   Tolling Agreements").  The December 3, 2001 e-mail, sent to Schochet, states, "I don't believe you are

6   being realistic given the circumstances. . . .  As it is, raising the money to pay for the settlement is a terrible

7   burden."  Opposition (Pascoe), Ex. A (December 3, 2001 e-mail).  In the September 23, 2002 letter,

8   counsel for Astor writes to Schochet that his actions caused Astor to "incur unnecessary legal fees."  *Id.*,

9   Ex. B (September 23, 2002 Letter).  The Tolling Agreements, dated November 7, 2002 and December

10   20, 2002, preserved "any claims [Astor] may have against Steefel relating to the Bankruptcy

11   Representation."  *Id*., Exs. C & D (Tolling Agreements).

12      With respect to Pascoe's fees, Astor cites to Plotnicki's declaration, in which he states that "[i]n

13   August 2001, I was very upset that Mr. Pascoe had compromised ASTOR's rights by compromising at the

14   Thorpe confirmation, and told him I was unhappy to be billed for his unauthorized malpractice."  Plotnicki

15   Decl., ¶ 9.  Astor also relies on a September 23, 2002 letter to Pascoe (identical in content to the one to

16   Schochet of the same date, discussed above) referring to "unnecessary legal fees" and the two Tolling

17   Agreements.  *See* Defendants' Opposition to Steefel Levitt & Weiss' Motion for Summary Judgment

18   ("Opposition (Steefel)"), Exs. A & B.[8]

19      With respect to the malpractice claims, Astor asserts that all of the lawyers representing Astor – on

20   both the bankruptcy proceeding and the litigation in New York – were a single team and therefore, are

21   jointly liable for each other's conduct.  Therefore, Astor asserts, the Moving Parties are not entitled to

22   summary judgment unless they can demonstrate as a matter of law that no malpractice was committed by

23   Steefel, Pascoe or Duane Morris.

24      In its Opposition to the Steefel Motion, Astor goes on to point to evidence that Schochet talked

25   Plotnicki into filing the New York action.  Opposition (Steefel) at 6 (quoting Ex. G (Fran Jacobs Depo.) at

26   _____

27      [8]Perhaps through inadvertence, the September 23, 2002  letter to Pascoe and the tolling agreements
    with Pascoe are attached to Astor's Opposition to the Steefel Motion, while the corresponding letter to
28   Schochet and tolling agreements with Steefel are attached to Astor's Opposition to the Pascoe Motion.

**United States District Court**

For the Northern District of California

116).  Further, according to Plotnicki, neither Schochet nor any other attorney ever told him that he could be "held responsible personally for maintaining the Thorpe action in New York."  *Id.* (citing to Plotnicki Declaration at ¶ 4).  In addition, Astor argues that Steefel committed malpractice by failing to advise him that the "bad faith" claims in *Roski III* were subject to the exclusive jurisdiction of the bankruptcy court.  Finally, Astor asserts that loss of a better settlement can be a basis for damages under California law and therefore, Steefel is not entitled to summary judgment on the basis that Plaintiff has not established he could have obtained a better settlement but for the alleged malpractice.

In its Opposition to the Pascoe Motion, Astor asserts that it has presented evidence that Pascoe committed malpractice by compromising Astor's interests at the confirmation hearing in the Thorpe bankruptcy after being instructed to object to the Plan.  Opposition (Pascoe) at 6.  According to Astor, this conduct injured Astor because it precluded Astor from appealing confirmation of the Plan and also foreclosed Astor's bad faith claims.  Astor also asserts that Pascoe, like Steefel, committed malpractice by failing to advise it that the bad faith claims in *Roski III* were subject to the exclusive jurisdiction of the bankruptcy court.  Finally, Astor asserts that loss of a better settlement can be a basis for damages under California law and therefore, Pascoe, like Steefel, is not entitled to summary judgment on the basis that Plaintiff has not established he could have obtained a better settlement but for the alleged malpractice.[9]

In their Reply briefs, Steefel and Pascoe point out that Astor's Opposition briefs were filed two days late and ask that the Court disregard them on that basis.  The Moving parties also note that several of the documents filed in support of Astor's Opposition briefs were designated as for settlement purposes only and argue that these documents, therefore, should not be considered.  On the merits, the Moving Parties assert that the evidence presented by Astor to show that it objected to an account stated is insufficient as a matter of law.  First, Steefel argues that the December 3, 2001 letter is ambiguous and does not constitute an objection to an account stated.  Second, the Moving Parties assert that the December 2002 letter and the Tolling Agreements – even if the Court considers them – do not create a material issue of fact because objections to an account stated must be made within a reasonable period and the letter and Tolling

---

[9]In its Opposition, Astor does not address Pascoe's assertion in his Motion that he owed no duty of care to Astor in the New York Action.

**United States District Court**

For the Northern District of California

1    Agreements were dated months (or years) after the relevant invoices were sent.  Third, as to Plotnicki's

2    statement in his declaration that he told Pascoe he objected to paying fees for Pascoe's unauthorized

3    compromise at the confirmation hearing, Pascoe argues that that statement would only apply to fees for the

4    time at the confirmation hearing, when the alleged malpractice occurred and would, in fact, provide

5    evidence that Astor acquiesced in all other fees.

6         Steefel and Pascoe reject Astor's assertion that all of the attorneys who represented Astor are

7    vicariously liable for the acts of the others.  They assert that communications and coordination between the

8    attorneys is not sufficient to establish professional or fiduciary duties among the attorneys.  They also point

9    to evidence that Steefel and Pascoe were never co-counsel or concurrent counsel with Duane Morris in the

10   various actions brought in New York and were never counsel of record in these actions.  Similarly, they

11   point out that Duane Morris was never counsel of record in the bankruptcy proceeding.

12        Steefel rejects Astor's assertion that it is not entitled to summary judgment because of Plotnicki's

13   declaration stating that Steefel did not advise him of the consequences of filing the New York Action and

14   that Astor would not have filed that action had it known it might result in personal liability in the Contempt

15   Proceeding.  Steefel points to evidence that Fran Jacobs believed and advised Plotnicki that the New York

16   Action did not fall under 11 U.S.C. § 1141 and therefore was not barred.  *See* Reply Declaration of David

17   W. Evans in Support of Plaintiff Steefel Levitt & Weiss' Motion for Summary Judgment ("Evans Reply

18   Decl."), Ex. 41 (May 1, 2001 e-mail from Jacobs to Schochet and Plotnicki stating that "Robot Wars'

19   claims against Thorpe are not dischargeable and are outside bankruptcy under *In Re Nuttal Equipment*

20   *Co., Inc.*, 188 B.R. 732, 737-738 (Bankr. W.D.N.Y. 1995), which holds that administrative claims in the

21   nature of ordinary business expenses are not discharged under 11 U.S.C. § 1141 because there is an

22   implicit agreement by the debtor-in-possession to pay such debts as they come due"); Ex. 39 (April 30,

23   2001 letter to David Chandler taking same position).  Steefel also argues that there is no contemporaneous

24   evidence in the record that any advice from Steefel would have persuaded Astor to drop the New York

25   Action.

26        On the question of judgmental immunity, Steefel asserts that Astor has presented no authority to

27   counter the cases cited by Steefel showing that the law governing remedies for violation of an automatic

28   stay was unsettled.  It also argues that Astor has presented no evidence showing that Steefel did not

1   research the issue before advising Plotnicki on the question and cites to time sheets that it asserts show that

2   Steefel adequately researched the issue.

3       With respect to Steefel's alleged failure to advise Astor that some of Astor's state law tort claims in

4   *Roski III* were preempted and should have been brought instead in the bankruptcy proceeding, Steefel

5   argues that there is no evidence that: 1) Steefel ever assumed a duty to Astor with regard to *Roski III*; 2)

6   that Astor could have obtained a finding of bad faith in the bankruptcy proceeding, given that Judge

7   Jaroslavsky had indicated he did not believe there was any bad faith; or 3) that dismissal of the preempted

8   claims in *Roski III* had any impact on Astor's decision to proceed to trial, given that numerous viable claims

9   remained in the case.  Steefel rejects the assertion that because Schochet reviewed the complaint and

10  offered some suggestions, he assumed a broad duty of care in the Roski action.  As evidence of the limited

11  nature of Schochet's role, Steefel points to the e-mail that accompanied the draft complaint, in which Fran

12  Jacobs wrote, "I want to be sure we don't say anything that would hurt us in the Thorpe bankruptcy case."

13  Evans Reply Decl., Ex. 42 (March 1, 2001 e-mail from Fran Jacobs to Harvey Schochet).

14  **III.   ANALYSIS**

15      **A.   Legal Standard**

16      Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions,

17  answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no

18  genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law."

19  Fed. R. Civ. P. 56(c).  In order to prevail, a party moving for summary judgment must show the absence of

20  a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a

21  defense on which the nonmoving party will bear the burden of persuasion at trial.  *Celotex Corp. v.*

22  *Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210

23  F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party

24  opposing summary judgment to "designate specific facts showing there is a genuine issue for trial."

25  *Celotex*, 477 U.S. at 323.  "A trial court can only consider admissible evidence in ruling on a motion for

26  summary judgment."  *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

27

28

United States District Court

For the Northern District of California

### B.    Account Stated Claims

The Moving Parties assert that they are, as a matter of law, entitled to the attorneys' fees incurred in representing Astor, under the California law doctrine of account stated.  In support of this contention, they point to evidence that Plotnicki entered into written fee agreements with Steefel and Pascoe (and in the case of Steefel, had the fee agreement reviewed by in-house counsel), and that Astor did not object to the growing legal fees, although it was regularly informed of the mounting bill.  The Court concludes that, with the exception of the time billed by Pascoe for the confirmation hearing in the bankruptcy proceeding, the Moving Parties are correct.

"An account stated is an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other." *Trafton v. Youngblood*, 69 Cal. 2d 17, 25 (1968).  The agreement may be express or it may be implied from the circumstances.  *Id*.  Thus, "'[i]f the account be sent to the debtor, and he do not object to it within a reasonable time, his acquiescence will be taken as an admission that the account is truly stated.'" *Id*. (quoting *Terry v. Sickles*, 13 Cal. 427, 429 (1859)).  The question of what constitutes a "reasonable time" to object is one of law for the court.  *Lacey Mfg. Co. v. Gold Crown Mining Co., Ltd.*, 52 Cal. App. 2d 568, 577 (1942).  California courts have held that a delay of six months in repudiating an agreement is unreasonable, as a matter of law, and will give rise to a presumption that an account stated has been created.  *Id*.  An objection with respect to a particular item in the account constitutes an admission of account stated as to the rest of the items if no objection is made to those items.  *Id.* at 758.

Notwithstanding the general rule that failure to object will give rise to a presumption that an account has been stated, "the rendering of an account, although not objected to, cannot create liability where no liability existed before." *Trafton*, 69 Cal. 2d at 26.  Thus, for example, in *Trafton* the court held that where an attorney took his legal fees from an escrow account established in the course of representing his client without first obtaining an agreement from his client that the attorney would be paid from the escrow account, there was no account stated, even though the attorney had subsequently sent his client a detailed invoice of his fees and the client failed to object.  *Id*. at 26.  The court called the invoice "'a memorandum of fait accompli of an erroneous, mistaken and wrongful act, of a taking an unfair advantage over the

**United States District Court**
For the Northern District of California

1   plaintiff to effect immediate payment in violation of defendant's admitted fiduciary relationship and obligation

2   to bill plaintiff as a condition precedent.'" *Id*. at 26 (quoting trial court decision in same case).

3          In determining whether an agreement exists where the account at issue is for legal services, "there is

4   a presumption of undue influence when entered between an attorney and client during their fiduciary

5   relationship." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d

6   1538, 1543 (9th Cir. 1988). This presumption does not apply if the fiduciary relationship had terminated at

7   the time of the account stated. *Id*. Where the fiduciary relationship has not been terminated, an attorney

8   can rebut this presumption by showing that the transaction "was fair and regular and entered voluntarily by

9   the client with full knowledge of the facts." *Id*.

10          In *Nilsson*, a law firm sued for legal fees under the doctrine of account stated, seeking to recover

11   fees incurred in 1980 and 1981 in connection with legal services provided the defendant. *Id*. at 1540-

12   1541. The law firm sent regular invoices to the defendant, which the defendant paid until August 1980,

13   then made a demand for payment in early 1982 for the outstanding balance, to which the defendant did not

14   respond. *Id*. The court held that the law firm was entitled to the outstanding fees because "Defendants

15   were informed of their mounting legal bill, they paid for services and did not dispute the amount up until

16   August of 1980, they failed to respond to the demand letter, and the account stated was made after the

17   attorney-client relationship had terminated." *Id*.

18          In response to the Motions, Astor does not dispute that the fee agreements with Steefel and Pascoe

19   were "fair and regular" and that it entered into the agreements  "with full knowledge of the facts." *See*

20   *Nilsson*, 854 F.2d at 1543. Nor does it present any evidence suggesting otherwise. Rather, it relies

21   entirely on evidence it says shows it objected to the accounted stated, arguing that this evidence creates a

22   material issue of fact. The Court does not find any of the evidence on which Astor relies to be sufficient to

23   establish a fact question except the statement in Plotnicki's declaration that he objected in August 2001 to

24   being billed for Pascoe's "unauthorized malpractice" in compromising at the Thorpe confirmation hearing.

25          First, no reasonable jury could conclude that the December 3, 2001 e-mail constituted an objection

26   to an account stated. As a preliminary matter, the significance of the statements in the e-mail message on

27   which Astor relies is not entirely clear because the message clearly occurred in the context of an ongoing

28   discussion, much of which was not provided to the Court. What is clear from the e-mail messages

United States District Court

For the Northern District of California

1    provided – the message from Plotnicki to Schochet discussed above and the message from Schochet to

2    Plotnicki that preceded it on the same day – is that the discussion concerned Plotnicki's "financial situation."

3    Opposition (Pascoe), Ex. A (December 3, 2001 message from Schochet to Plotnicki).  In light of this

4    evidence, and in the absence of any evidence supporting a contrary interpretation, the reference to "the

5    circumstances" in the response from Plotnicki can only be interpreted as a reference to Astor's ability to

6    pay its fees.  This interpretation is supported by the Plotnicki's statement, in the paragraph following the

7    reference to his "circumstances,"  that "raising the money to pay for the settlement is a terrible burden."

8    Nothing in Plotnicki's e-mail suggests he was objecting to an account stated.  If anything, the e-mail

9    suggests an implicit acquiescence to an account stated.

10            Second, the letters to Pascoe and Schochet dated September 23, 2002, asserting that Steefel's and

11    Pascoe's actions led Astor to incur "unnecessary legal fees" also do not create a fact question on the

12    account stated claims.  First, these letters are designated "Highly Confidential – For Settlement Purposes

13    Only" and therefore, may be inadmissible under Rule 408 of the Federal Rules of Evidence.[10]  More

14    importantly, these letters were not sent within a reasonable time of the invoices which give rise to an

15    account stated.  Evidence presented by Steefel indicates that the fees it seeks to recover were billed to

16    Astor no later than March 18, 2002 – more than six months before Plotnicki's letter.  *See* Declaration of

17    Steve Wahle in Support of Plaintiff Steefel Levitt & Weiss's Motion for Summary Judgment ("Wahle

18    Decl."), Ex. A (print-out of Steefel's accounts receivable for Astor listing invoice dates and amounts);

19    Steefel's Appendix, Ex. 26 (copies of invoices).  Similarly, the fees sought by Pascoe were billed no later

20    than March 8, 2002.  Pascoe Decl., Ex. C (invoices).  As a result, Astor's reliance on these letters to

21    challenge the account stated claims is misplaced.  *See Lacey*, 52 Cal. App. 2d at 577 (delay of six months

22

23

24

25

26            [10]Under Rule 408, evidence of settlement offers is inadmissible to prove "liability for or invalidity of"
     a claim.  On the other hand, such evidence may be admissible for other purposes.  *See Carney v. The*
27    *American University*, 151 F.3d 1090, 1095 (D.C. Cir. 1998).   While Astor is, arguably, relying on the
     September 23, 2002 letters to establish invalidity of the account stated claims, the Court declines to rule on this
28    issue, which has not been briefed by the parties in any meaningful way.

United States District Court

For the Northern District of California

is unreasonable, as a matter of law).[11]  For the same reason, the Tolling Agreements – even assuming they are admissible – do not rebut the presumption of account stated.

On the other hand, there is a fact question with respect to fees associated with Pascoe's representation of Astor at the confirmation hearing.  The confirmation hearing apparently took place in April 2001, and so fees were included in the invoice dated May 1, 2001.  *See* Pascoe Decl., Ex. C.  According to Plotnicki, he objected to these fees in August 2001.[12]  Because this objection was made less than six months after the services at issue were rendered, the Court cannot conclude, as a matter of law, that the objection was not made within a reasonable time.  Therefore, with respect to these fees only, there is a material issue of fact precluding summary judgment.  As to all remaining fees, the Court concludes that Steefel and Pascoe are entitled to summary judgment on the account stated claims.

### C.    Malpractice Claims

#### 1.    Vicarious Liability

Astor asserts that Pascoe, Steefel and Duane Morris are all vicariously liable for any malpractice of the others in representing Astor.  The authority cited by Astor does not support its position.

First, *Musser v. Provencher*, 28 Cal. 4th 274 (2002), is not on point.  In that case, the question of whether co-counsel or associated counsel could be held vicariously liable for each other's malpractice was not addressed.  Rather, the court in that case addressed whether counsel could sue co-counsel for indemnification where counsel had been sued by the client for malpractice based on the negligent acts of co-counsel.  *Id*. at 279.

Second, *Floro v. Lawton,* 187 Cal. App. 2d 657 (1960), is distinguishable.  There, an attorney who was retained to represent the plaintiff discovered a scheduling conflict and therefore brought in another attorney to conduct the trial, with the agreement that fees would be split between the two attorneys.  *Id*. at

---

[11]At oral argument, Astor asserted that *Lacey* should not be read to create a bright-line rule that a six-month delay is, as a matter of law, unreasonable.  Rather, Astor argued, *Lacey* merely stands for the proposition that under the specific circumstances of that case, six months was unreasonable.  Assuming Astor is correct,  the Court nonetheless finds the delay in this case to be unreasonable because there is no evidence in the record  that the circumstances here are distinguishable from those in *Lacey*.

[12]Pascoe denies this conversation occurred.  Pascoe Reply at 3, n.5.  In the face of this factual dispute, the Court, drawing all inferences in favor of the party opposing summary judgment, assumes Plotnicki's version of the facts to be true.

United States District Court

For the Northern District of California

662. The arrangement was explained to the plaintiff, who consented. *Id*. Here, there was no agreement to split fees and, therefore, there is no vicarious liability. *See Wildermann v. Wachtell*, 149 Misc. 623 [267 N.Y.S. 840] (1933) (holding that where the client is informed of the necessity and reason for his attorney's retaining another lawyer for certain purposes and the client approves such employment, the client cannot recover from the original attorney for the negligence of the retained attorney); *see also* 7A C.J.S. Attorney & Client § 289 ("a client who is informed of the necessity and reason for the attorney's retaining another lawyer for certain purposes and approves of such employment, ordinarily cannot recover from the original attorney for the negligence of such associate, except in a situation where the attorneys have agreed to divide the fee, in which case, each would be responsible to the client").

### 2.    Legal Standard for Attorney Negligence

In order to prevail on a claim for attorney malpractice, which is a form of professional negligence, a plaintiff must establish the essential elements of duty, breach of the standard of care, causation and damages. *Budd v. Nixen*, 6 Cal. 3d 195, 200 (1971). "The existence of a legal duty, if any, is a question of law for determination by the courts." *King v. United States*, 756 F. Supp. 1357, 1360 (E.D. Cal. 1990) (citing Witkin, Torts § 748 at 83). "A court determines whether a duty is imposed by law as a matter of policy. . . . Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damages done." *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 464 (2003) (citations omitted). While courts consider a variety of factors, the critical question is foreseeability, that is, whether the category of conduct at issue is sufficiently likely to cause the type of harm experienced by the plaintiff to make the imposition of liability appropriate. *Id*. at 465. The court in *Friedman* explained, "foreseeability of harm must be reasonable. . . . More than a mere possibility of occurrence is required since, with hindsight, everything is foreseeable." *Id*.

To prove breach of the standard of care, a plaintiff must show that his attorney's "advice and actions were so legally deficient when given that it demonstrates a failure to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in performing the tasks they undertake." *Unigard Ins. Group v. O'Flaherty & Belgum*, 38 Cal. App. 4th 1229, 1237 (1995).

In order to prove causation, a plaintiff must prove that but for the attorney's negligence, a better result could have been obtained in the underlying action. *Travelers Ins. Co. v. Lesher*, 187 Cal. App. 3d

1    169, 197 (1986) (citing *Cook v. Superior Court*, 19 Cal. App. 3d 832, 834 (1971)).   The court in

2    *Travelers* explained this rule as follows:

> An attorney malpractice action, then, involves a suit within a suit, a
> reconsideration of the previous legal claim, and only by determining whether
> or not the original claim was good can proximate damages be determined.
> This trial within a trial avoids the specter that the damages claimed by a
> plaintiff are a matter of pure speculation and conjecture.

6    *Id*. (citation omitted).  Causation refers not to "a layman's notion of actual cause," but instead, to proximate

7    cause. *Golden v. Dungan*, 20 Cal. App. 3d 295, 311 (1971).  Proximate cause "is always, in the first

8    instance, a question of law. . . .  It becomes a question of fact when conflicting inferences or conclusions

9    can be drawn from the evidence within the area of proximate cause as legally defined." *Id*. (citations

10   omitted).

### 3.        Malpractice Claim Against Steefel

12          Astor's malpractice claim against Steefel is based on two theories.  First, Astor asserts that Steefel

13   (specifically, Schochet) failed to advise Plotnicki that by filing the New York Action, Astor could be

14   subjected to a contempt proceeding and possible sanctions, causing Astor to incur attorneys' fees in the

15   Contempt Proceeding and resulting in a less advantageous settlement with Thorpe than otherwise could

16   have been obtained.  Second, Astor argues that Steefel assumed a duty of care in the *Roski III* action and

17   breached that duty by failing to advise Astor that some of the claims in *Roski III* could only be brought in

18   the bankruptcy proceeding.[13]  The Court concludes that material issues of fact exist with respect to the

19   question of whether Schochet's advice may have caused Astor to incur fees in the Contempt Proceeding.

20   On the other hand, Astor's assertion that Steefel's conduct resulted in a less advantageous settlement than

21   otherwise could have been obtained in the bankruptcy litigation is speculative and therefore fails.  Further,

25          [13]In addition, Astor stated in its interrogatory responses that Steefel committed malpractice by failing
to provide an estimate of costs in the Thorpe bankruptcy or a cost benefit analysis.  *See* Steefel's Appendix,
Ex. 32 (Interrogatory responses, No. 10).  Astor has abandoned this theory, however, having failed to respond
in its Opposition to arguments on this point in Steefel's Motion.   Nor does Astor dispute Steefel's assertion
that it did not commit any malpractice in prosecuting the first Adversary Proceeding (in which the appeal was,
for the most part, successful) or the appeal of the confirmation plan (in which Steefel, just after Plotnicki
independently settled the case, obtained a stay of enforcement without bond).  See Motion at 18.  Therefore,
to the extent Astor's claims are based on those theories, they are dismissed with prejudice.

United States District Court

For the Northern District of California

1   the Court concludes that to the extent Astor's malpractice claim against Steefel is based on *Roski III*, the

2   claim fails because Steefel owed no duty to Astor in that action.

3   **a.     The New York Action**

4   Steefel asserts that for two reasons, it is entitled to summary judgment on Astor's malpractice claim

5   to the extent it is based on the alleged failure of Schochet to advise Astor of the possibility it would face

6   contempt sanctions as a result of filing the New York Action.  First, Steefel claims that it is entitled to

7   judgmental immunity because during the relevant time period, it was not clear whether Astor could be

8   subjected to contempt sanctions as a result of filing the New York Action.  Second, Steefel asserts that

9   Astor's theory of damages is purely speculative and therefore fails as a matter of law.[14]

10   **i.     Judgmental Immunity**

11   Under the doctrine of judgmental immunity, an attorney is immunized from liability "'resulting from

12   an honest error in judgment concerning a doubtful or debatable point of law.'" *Village Nurseries, L.P. v.*

13   *Greenbaum*, 101 Cal. App. 4th 26, 36 (2002) (quoting *Davis. v. Damrell*, 119 Cal. App. 3d 883, 887

14   (1981)).  Judgmental immunity applies where an attorney establishes both: 1) that the law that was the

15   subject of the professional advice was unsettled at the time the advice was given; and 2) the attorney

16   performed "reasonable research" to ascertain relevant legal principles and to make an "informed decision as

17   to the course of conduct based on an intelligent assessment of the problem."  *Id.* (citing *Smith v. Lewis*, 13

18   Cal.3d 349 (1975)).

19   Here, Steefel argues that availability of contempt sanctions was an unsettled area of the law in the

20   spring of 2001, citing to *In re Dyer*, 322 F.3d 1178 (9th Cir. 2003).  The Court does not agree. A careful

21   reading of *Dyer*, and the authority to which it cites, indicates that by 2001, the law in this respect was

22   already settled.  In *Dyer*, the Ninth Circuit addressed whether, pursuant to 11 U.S.C. § 105(a), contempt

23   sanctions could be awarded by the bankruptcy court for violation of an automatic stay.  322 F.3d at 1189.

24   The court noted that "the availability of civil contempt sanctions has a checkered past in our circuit."  *Id.* at

25   1190.  In a footnote, the court explained its comment in a footnote, stating as follows:

26

27   —————————————

28   [14]Steefel does not dispute that it owed a duty of care to Astor in connection with the filing and maintaining of the New York Action.

United States District Court

For the Northern District of California

> At one time, this circuit held that § 105(a) did not authorize civil contempt sanctions. *Plastiras v. Idell (In re Sequoia Auto Brokers)*, 827 F.2d 1281, 1284-85 (9th Cir.1987). Subsequently, however, we reached the opposite conclusion. In *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 620 (9th Cir.1993) we held, without citing *Sequoia*, that § 105(a) authorizes civil contempt damages for an automatic stay violation. On this point, Goodman's holding has been followed--see, e.g., *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir.2002); *Walls v. Wells Fargo Bank*, 276 F.3d 502, 507 (9th Cir.2002); *Del Mission*, 98 F.3d at 1152- 53; *Pace*, 67 F.3d at 193-94--while *Sequoia's* holding was overruled by *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine)*, 77 F.3d 278, 284-85 (9th Cir.1996). Although the reasoning of *Rainbow Magazine* relied heavily upon a now-repealed bankruptcy provision, id. at 284, its holding regarding the availability of civil contempt in bankruptcy continued to be followed and became the settled law of the circuit.

*Id*. at 1190 n.13.  In fact, the Court has found *no* case law within this Circuit after the 1996 reversal of *Sequoia* holding that civil contempt sanctions could not be awarded by the bankruptcy court.  To the contrary, a number of courts held that such sanctions were available.  *See, e.g., In re Lapin*, 226 B.R. 637, 641 (1998) (holding that under *Rainbow*, bankruptcy panel could award civil contempt sanctions and that *Sequoia* was no longer good law); *In re Marvel*, 265 B.R. 605, 609 (2001) (holding that under *Rainbow*, bankruptcy court has inherent power to impose contempt sanctions).  Therefore, the Court concludes that Steefel has not met the first prong of the *Davis* test.

The Court also is not persuaded that the evidence presented by Steefel is sufficient to meet the second prong of the test, showing reasonable research.  The court in *Village Nurseries* described this inquiry as follows:

> [I]n determining whether to grant summary judgment based on the judgmental immunity doctrine, it is "[a]n attorney who has conducted a thorough, contemporaneous research effort,' demonstrated 'detailed knowledge of legal developments and debate in the field,' and made a decision which represented a 'reasoned exercise of an informed judgment grounded on a professional evaluation of applicable legal principles,' [who] may be entitled to judgment as a matter of law."

101 Cal. App. 4th at 37 (citations omitted).  Steefel cites to seven pages of time entries to show that it conducted reasonable research.  *See* Steefel Motion at 20 (citing to Steefel's Appendix, Ex. 26 (time sheets) at 21-28).  However, not a single time entry explicitly references the specific question at issue here, that is, whether the bankruptcy court had the inherent authority to impose contempt sanctions.  There is simply nothing in the record from which the Court can conclude that Schochet's advice was based on a

22

United States District Court

For the Northern District of California

1  "detailed knowledge of the legal developments and debate in the field." *See Village Nurseries,* 101 Cal.

2  App. 4th at 37.

3      The Court concludes that Steefel has failed to establish it is entitled to summary judgment on the

4  basis of judgmental immunity.

5                              **ii.        Causation of Damages**

6      Steefel asserts that the damages allegedly caused by its advice regarding the consequences of filing

7  the New York Action are speculative and therefore, Astor's malpractice claim, to the extent it is based on

8  that theory, fails.  The Court agrees to the extent Astor seeks damages based on its failure to obtain a more

9  favorable settlement.  However, the Court disagrees to the extent Astor seeks to recover the attorneys'

10  fees and costs incurred in the Contempt Proceeding.

11     It is established under California law that "'[d]amages may not be based upon sheer speculation or

12  surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not

13  render it actionable.'" *Thompson v. Halvonik*, 36 Cal. App. 4th 657, 661 (1995) (quoting *In re

14  Easterbrook*, 200 Cal. App. 3d 1541, 1544 (1988)).  Thus, in *Thompson*, the court granted summary

15  judgment in favor of an attorney on a malpractice claim where the plaintiff presented no evidence that the

16  settlement in the underlying action would have been greater but for the attorney's alleged negligence. *Id.*;

17  *see also Marshak v. Ballesteros*, 72 Cal. App. 4th 1514, 1519 (1999) (granting summary judgment in

18  favor of attorney on malpractice claim where underlying action had settled and plaintiff had presented no

19  evidence that but for attorney's negligence case would have settled for more than it did).

20     In response to Steefel's Motion, Astor has presented *no evidence* that it could have obtained a

21  better settlement in the Thorpe bankruptcy proceeding but for Steefel's alleged malpractice.  Therefore,

22  Astor's claim fails to the extent it is based on the theory that it could have obtained a better settlement.

23     On the other hand, there is a direct connection between the attorneys' fees incurred in the

24  Contempt Proceeding and Schochet's advice – if Plotnicki's testimony is credited – regarding whether

25  Astor should file, and later, proceed with the New York Action.  If a jury were to believe Plotnicki's

26  testimony that he was never told he might be subjected to a contempt proceeding and would not have filed

27  the New York Action if he had known, it could reasonably conclude that the attorneys' fees and costs

28  incurred in the Contempt Proceeding were a direct result of Schochet's alleged negligence.  Therefore,

United States District Court

For the Northern District of California

1 summary judgment is denied with respect to the question of whether Steefel's alleged negligence caused

2 Astor to incur attorneys' fees and costs in the bankruptcy proceeding.

3             **b.**    ***Roski III***

4         Astor asserts that Steefel committed malpractice when it failed to advise that the state law claims

5 alleging the bankruptcy action was brought in bad faith could only be brought in the bankruptcy proceeding.

6 According to Plotnicki, had he known this, he would not have filed *Roski III*.  Steefel asserts that it is

7 entitled to summary judgment on this claim because it did not assume a duty of care with respect to *Roski*

8 *III* and, in any event, there is no evidence that any negligence in that respect was the proximate cause of

9 damages to Astor.  The Court concludes that Steefel owed no duty of care to Astor in *Roski III* and

10 therefore does not reach the second issue.

11         The critical question in determining whether a duty exists is foreseeablity.  *Friedman v. Merck &*

12 *Co.*, 107 Cal. App. 4th at 464.  Here, it was not foreseeable that Schochet's failure to advise Astor of the

13 preemption issue – an issue that had no impact on the bankruptcy proceeding and related only to the

14 likelihood of success in *Roski III* –  would result in the harm alleged to have occurred.  It is undisputed that

15 Plotnicki and Jacobs had discussed filing the action in *Roski III* long before Schochet became involved in

16 any Astor litigation, that Jacobs drafted and signed the complaint in *Roski III* and that Schochet was not

17 provided a copy of the complaint until four days before the action was filed.  Further, although Jacobs

18 testified somewhat vaguely that she *thought* she was asking Pascoe and Schochet to "look at [the *Roski III*

19 complaint] as bankruptcy lawyers and consider the things that would be something that bankruptcy lawyers

20 would understand," *see* Opposition (Pascoe), Ex. G (Jacobs Depo.) at 161, the only evidence in the record

21 concerning a *specific* communication to Schochet or Pascoe regarding Jacob's expectations is an e-mail to

22 Schochet in which Jacobs asked him to review the complaint to "be sure we don't say anything that would

23 hurt us in the bankruptcy case."  Evans Reply Decl., Ex.42.  The edits provided by Schochet in response –

24 which were largely grammatical and proofreading corrections – further support the conclusion that

25 Schochet's role was extremely limited.  In short, there is no evidence that Schochet was ever asked to do

26 anything but make sure the *Roski III* action did not hurt Astor in the bankruptcy proceeding.  Nor is there

27 any evidence Schochet undertook any duty to go beyond this limited role.  Therefore, Steefel is entitled to

28 summary judgment on Astor's malpractice claim to the extent that it is based on *Roski IIII*.

United States District Court

For the Northern District of California

### 4.      Malpractice Claim Against Pascoe

Astor's malpractice claim against Pascoe is based on the same theories as are asserted against Steefel, as well as an additional theory that Pascoe committed malpractice by compromising at the confirmation hearing.

As discussed above, with respect to the New York Action the Court finds the allegation that Astor was damaged because it was forced to accept a less favorable settlement than it otherwise would have obtained is speculative.  Therefore, the claim is dismissed to the extent it is based on that theory.  On the other hand, to the extent Astor alleges it incurred unnecessary legal fees in the Adversary Proceeding as a result of Pascoe's advice encouraging him to file the New York Action, there is a disputed question of fact.[15]

With respect to *Roski III*, the Court finds that Pascoe, like Steefel, owed no duty to Astor in that action.  As discussed above, the only specific communication in the record indicates Jacobs asked Pascoe and Schochet to review the *Roski III* complaint to be sure it would not result in  negative repercussions in the bankruptcy litigation.  Moreover, there is no evidence in the record that Pascoe even responded to the request, much less that he offered any suggestions to Jacobs regarding the *Roski III* complaint.  Under such circumstances, it is unreasonable to impose a duty of care in *Roski III* upon Pascoe because the alleged harm was not foreseeable.

Finally, the malpractice claim against Pascoe based on his alleged compromise at the bankruptcy reorganization plan hearing fails because there is no evidence Pascoe's alleged conduct caused any damages.  The only evidence in the record on this issue is Plotnicki's statement that "[i]f Mr. Pascoe had

_____

[15]At oral argument, the Court tentatively concluded that Pascoe did not advise Astor with respect to the filing or maintaining of the New York Action and therefore, the malpractice claim against Pascoe should be dismissed to the extent it was based on the New York Action.  This conclusion was based on Astor's failure to argue in its Opposition to the Pascoe Motion that Pascoe himself committed any malpractice in connection with the New York Action.  The Court also noted that it was undisputed that  the complaint in the New York Action was not sent to Pascoe.  In response to the Court's tentative conclusion, Astor pointed only to evidence that Pascoe was part of the "team" that represented Astor.  The Court found this evidence to be insufficient to establish a fact question as to whether Pascoe breached a duty of care to Astor.  However, a careful review of the evidence following oral argument revealed that there is specific testimony by Plotnicki that not only Schochet but also Pascoe told him he "had to" file the New York action.  *See* Steefel's Appendix, Ex. 23 (Plotnicki Depo.) at 195.  While this testimony is difficult to credit given the overwhelming evidence that Pascoe was *not* involved in the decision to file and/or maintain the New York Action, it is not the role of the Court on summary judgment to resolve factual disputes.

United States District Court

For the Northern District of California

1  not compromised [Astor's] position at the bankruptcy plan confirmation, Astor would have appealed any

2  confirmation of Thorpe's Plan."  Plotnicki Decl., ¶ 7.  Given that the June 11, 2001 Order of the

3  bankruptcy court denying Astor's motion for reconsideration clearly states that "Astor has appealed the

4  order confirming the plan,"  Pascoe Request For Judicial Notice, Ex. B (June 11, 2001 Order), the Court

5  can find no evidence of any damages resulting from Pascoe's representation of Astor at the confirmation

6  hearing.[16]  This conclusion finds further support in Judge Jaroslavsky's statement in the June 11, 2001

7  Order that had Astor not compromised at the hearing, he would likely have overruled Astor's objection

8  and confirmed the plan.[17]  *Id.*

9  **IV.**     **CONCLUSION**

10         Summary Judgment is GRANTED in part and DENIED in part as follows: Summary Judgment is

11  GRANTED in favor of Steefel on Steefel's account stated claim.  Summary judgment is GRANTED in

12  favor of Pascoe on the account stated claim, except as to fees for representation at the confirmation

13  hearing, as to which, summary judgment is DENIED.  Summary judgment is GRANTED in favor of Steefel

14  and Pascoe on Astor's malpractice claims *except* to the extent Astor alleges Steefel's and Pascoe's advice

15

16

17

18

19

20

21

---

22         [16]At oral argument, the Court raised this issue and gave Astor an opportunity to address it.  Astor did
23  not dispute that the order confirming the Plan was, in fact, appealed and that a stay of implementation of the
    Plan was later obtained.

24         [17]In its Opposition, Astor also argued in passing that by compromising at the confirmation hearing,
    Pascoe "foreclosed [Astor's] bad faith claims."  Opposition (Pascoe) at 6.  It is not clear how the alleged
25  compromise prevented Astor from asserting or prevailing on bad faith claims in the bankruptcy proceeding.
    Even if Pascoe's actions did theoretically "foreclose" such claims, however, there is no causation of damages
26  because Judge Jaroslavsky had already found in October 2000, in rejecting a motion to dismiss the bankruptcy
    action, that the bankruptcy was not brought in bad faith.  *See* Steefel's Appendix, Ex. 3 (Transcript of October
27  10, 2000 bankruptcy proceeding) at 4 (Judge Jaroslavsky stating that "when I estimated the claim I put in there
    a finding of bad faith.  And when I decided the case for finally, I took that out.  Now that's what I intended to
28  do.").

regarding the New York Action caused it to incur attorneys' fees and costs it otherwise would not have in the Contempt Proceeding.

IT IS SO ORDERED.

Dated: May 31, 2005

/s/ Joseph C. Spero
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California

27